**SHELL OIL COMPANY, Appellant,**

v.

**Joe Henry REINHART et al., Appellees.**

No. 5587.

Court of Civil Appeals of Texas.

El Paso.

Oct. 2, 1963.

Rehearing Denied Oct. 30, 1963.

Turpin, Kerr, Smith & Dyer, Max N. Osborn, Midland, for appellant.

John J. Watts and Thomas A. Sneed, Odessa, for appellees.

FRASER, Chief Justice.

This is an appeal from a judgment awarding the appellee and intervenor $35,000.00 for damages in a third-party suit against the lease owner whose well was being treated by an independent contractor at the time of the accident.

The circumstances leading up to the incident which is the basis for this lawsuit are as follows: The appellant, Shell Oil Company, entered into a written contract with a company known as Cody & Teague Transport, Inc., hiring the latter to process certain wells belonging to appellant so as to remove a build-up of paraffin in the tubing. This process consisted mainly of pumping hot oil into the well so as to melt the paraffin and thereby permit it to be pumped out of the well and into the receiving line. In addition to this procedure, a paraffin solvent was introduced into the wells. It is uncontradicted that this solvent was a highly inflammable chemical. On the day of the accident appellee Reinhart and his foreman, a Mr. McWhorter, the employees of Cody & Teague, met with a foreman of appellant, who explained to them the job to be done, which apparently

consisted of treating two wells. It appears from the record that one well was treated successfully and without incident. During the treatment of the second well the accident occurred. It seems that at the well a man named Faulkner, described as a pumper for Shell Oil Company, was performing some sort of service. The jury said it was a supervisory one in effect, but the trial judge, by his ruling that appellee was not a loaned servant or employee, held that it was not. In any event, this pumper of appellant and the appellee found out that the little pump on one of the two trucks there present and belonging to Cody & Teague would not, at this particular well, pick up the solvent out of the bucket into which it had been poured from a ten-gallon drum. Faulkner, the appellant's pumper, and appellee then got on top of what they called the hot oil truck tank, and began pouring the solvent directly into the hose. This operation was almost completed when, for some reason, the oil came back up out of the hose and ignited when it hit the hot manifold of the transport truck. Cody & Teague had two trucks there for this operation. When the solvent came back out of the hose and caught fire, appellee was allegedly burned. His statement is that his "britches leg" had been saturated with the solvent, and that when the fire happened, it ignited his "britches leg" and he was burned, resulting in the claimed injuries. The case was tried to a jury and the theory of "loaned servant" was pleaded, among other defenses, by the appellant.

We feel that this case must be re-tried as, in our opinion, not only are there reversible errors present, but the answers of the jury to the various issues are so in conflict that a judgment thereon cannot be properly sustained.

Reviewing the issues as to ultimate facts the jury found as follows: That appellant furnished a highly inflammable solvent and that such was negligent and a proximate cause; that appellant failed to post visible sign warnings with regard to this inflammable solvent and that such was negligent and a proximate cause; that appellant directed that the solvent be poured directly into the pump mechanism, and that this was negligent and a proximate cause. After all these findings, the jury then, in Issue No. 10, answered *that appellant did not fail to warn plaintiff that the paraffin solvent used upon the occasion was highly inflammable.* Then, after the finding of damages, the jury found that plaintiff-appellee failed to ascertain that the solvent was dangerous and inflammable, and that such failure was negligent, but not a proximate cause. Then, in Issues 17, 18 and 19, the jury further found that plaintiff-appellee failed to heed the warnings and cautions upon the barrels of the paraffin solvent; that such failure was negligent, but not a proximate cause of his injury. They further found that his own foreman failed to warn him of the danger in using this solvent; that such was negligence, but was not a proximate cause of his injury. They also found that the foreman failed to heed the warnings of danger and caution on the barrels of solvent and that such was negligence, but not a proximate cause of plaintiff's injury. They further found that McWhorter (Cody & Teague's foreman and plaintiff's boss) permitted the solvent to be poured into the hose, and that such was negligence but not a proximate cause. The jury then further found that Cody & Teague failed to warn plaintiff of the danger in using the solvent, but that such was not negligence. Then they found that plaintiff failed to keep a proper lookout for his own safety, but held that this was not a proximate cause of the accident. Then, in answer to Issue 34, the jury found that plaintiff was a special, or loaned, employee of appellant. There does not seem to have been any controversy over the definition attached to this issue. Then, in Issue 35 the jury found that plaintiff assumed the risk of the danger in which he became involved. In Issue 36 the jury was asked if plaintiff knew, or by the exercise of ordinary care should have known, that the solvent was inflammable. The jury answered "No", even though in Issue 10 they found that

appellant had not failed to warn plaintiff that the solvent was highly inflammable. Lastly, the jury found that the incident was not the result of an unavoidable accident.

The first groups of issues, to-wit, numbers 1 to 6, we think were negatived by the jury's finding that the appellant did not fail to warn appellee that the material used was a highly inflammable solvent. Issues 7, 8 and 9 pose a peculiar problem in view of the court's holding. The court held, as a matter of law, that in his judgment plaintiff was not a loaned servant or employee of appellant; but in answer to Issues 7, 8 and 9 the jury says that appellant directed the solvent to be poured directly into the mechanism. This being true, and the court having held that plaintiff was not a loaned employee and therefore not under the supervision of appellant, it seems to us inescapable that plaintiff then must have, by the answers of the jury and the ruling of the court, voluntarily gone up on the truck to help pour a product into the hose which the jury said Shell had not failed to warn him was dangerous. If, as the court holds, he was not a loaned servant, then, of course, he was not in a position of assuming a risk (although the jury later found that he had assumed the risk), as assumed risk, we believe, applies to employees under the control of a negligent employer. Plaintiff himself says that his boss had nothing to do with his getting up on the truck and, by his own testimony, placed him away and on the other side of the truck. There is no evidence in the record from McWhorter, plaintiff's boss. He neither testified directly nor by deposition, so we are left with the presumption, on the basis of the jury's finding and the court's ruling, that plaintiff voluntarily clambered up on to the truck along with Faulkner, the agent of the defendant, to pour this solvent into the hose. Plaintiff himself testified that the solvent was put in first, and under fairly intensive examination the plaintiff testified that it was the pumper, the agent of defendant, who directed the entire operation with reference to the inflammable solvent. He says that the pumper decided that "we would pour it into the hose instead of in the truck". Plaintiff further says—and we here reproduce parts of the record in order to illustrate the actual situation—as follows: (the following excerpts are included as gathered together in appellant's brief, and we include Statement of Facts page numbers to show the location of each):

Cross examination:

"Q What happened then after he (Faulkner) got out there with this stuff, did you proceed to pour it into the well or what?

"A We poured it in a five gallon bucket and was going to pump it with that little pump into the well before we put the hot oil in it and the pump wouldn't pick it up. He said, 'Well, it is too thin.' Then he said, 'let's pour it in the truck.'

"Q Was it at his suggestion that you poured it in the truck?

"A That is right. I got up on top of the truck to open the top." (S.F. 37) * * *

"Q What did you all do?

"A He decided we would pour it in the hose instead of in the truck." (S.F. 38) * * *

"Q As far as putting the paraffin solvent in there, he (McWhorter) was the one in charge of the whole job, wasn't he?

"A I wouldn't say that. The pumper was out there and telling us what to do." (S.F. 54) * * *

"Q Now, who did you say made the decisions? As I understand your testimony, the pumper decided you would pour it in the truck, is that right?

"A Yes. The pumper is the man that told me to get up on the truck and open it and he would hand it to me and we would pour it in there." (S.F. 60) * * *

"Q You were going to get up on there and pour it in there?

"A That is right.

"Q Then you decided you would pour it in the hose?

"A The pumper did.

"Q The pumper did. That is not what you told me when I took your deposition.

"A I think it is.

"Q You told me in your deposition, did you not, Mr. Reinhart, that we decided to pour it into the hose, do you recall that? That is on page 28, about the third question. 'All right, then what happened' and your answer was 'Well, he got up there with me and we decided that we would pour it in there, that we would just pour it in the hose.' You said there 'we'.

"A I believe that should have been he instead of we." (S.F. 60–61) * *

"Q Isn't it the truth of the matter that Mr. McWhorter is the one that was directing the operations out there and Mr. McWhorter was the one that suggested that you all get up on the truck?

"A No, Mr. McWhorter was on the off side of the truck from me and the pumper." (S.F. 61) * * *

"Q I realize he was on the off side of the truck, but I asked you if he wasn't the one that suggested that you all get up on top of the truck?

"A No, he wasn't.

"Q Was he the one that suggested that you all pour it in the hose?

"A No, he didn't do that.

"Q It was you or the pumper that decided that, wasn't it?

"A It was the pumper that decided that." (S.F. 63) * * *

"Q Now, before you got up there you were one of the people that picked up this barrel to pour it in the bucket, weren't you?

"A Me and the pumper, he said for me to help pour this in the bucket, and we poured around four gallons of it in the bucket." (S.F. 64) * * *

Re-direct examination:

"Q Is the pumper the one that decided to pump it through the pump on the truck?

"A That is right." (S.F. 72) * *

"Q Mr. McWhorter was in charge of the hot oil truck?

"A That is right.

"Q He didn't tell you to put the paraffin in there, he didn't make the decision on whether to put it directly in the well or in the pump?

"A No, the pumper was the one that would tell us.

"Q In other words, Mr. McWhorter was in charge of the job in so far as the hot oil operation was concerned and the pumper was in charge of the hot oil solvent that was to go in the well, is that right?

"A Yes, sir." (S.F. 79)

Re-cross examination:

"Q There is not any question but that Mr. McWhorter was the one giving the directions out there and giving instructions as to how the work was to be done?

"A Well, I wouldn't say that, I would say the pumper was out there to do that." (S.F. 79)

Re-direct examination:

"Q But he (McWhorter) didn't have anything to do with the well or solvent?

"A That is right." (S.F. 81)
Re-direct examination:

"Q Did he (Faulkner) mention anything to you other than just request that you help him do the job that he was doing?

A "That is all.

"Q When did your job of treating the well begin? I am talking about Cody & Teague's job on each particular well, just when did it begin? Did it begin when you got there or did it begin when you were to treat the well with hot oil?

"A I would say that Cody & Teague's part of it would begin when you went to treat the well with hot oil.

"MR. OSBORN: Just a minute, we object to that as calling for a conclusion and opinion on the part of the witness.

"THE COURT: Sustained.

"Q Was the solvent put in the well first or was the hot oil treatment begun first?

"A Well, the solvent was put in the well first.

"Q And then the hot oil treatment?

"A Then the hot oil treatment.

"Q At the time your accident happened had you begun to put the hot oil into the well?

"A No, we had not." (S.F. 170, 171)

It is clear from the above reproduced testimony that plaintiff claims his boss had nothing to do with his pouring the solvent in the hose and that he, the plaintiff, was convinced that he was under the orders of the Shell agent, Faulkner; and the jury so found. But the judge held, as a matter of law, that plaintiff was not a loaned servant. As heretofore stated, Issues 7, 8 and 9 answer that the Shell agent directed that the solvent be poured into the pump mechanism.

Summing up this particular portion of the judgment, it seems clear to us that the jury having definitely found that appellant did not fail to warn plaintiff that the solvent was dangerous and highly inflammable, and the judge having found that plaintiff was not under the supervision of Shell, and plaintiff himself having stoutly maintained that he was not at that time under the orders of his own boss, that when he went up on top of the truck it must have been his own idea, and (on the basis of his knowledge that this solvent was inflammable) would certainly strongly suggest contributory negligence. We believe the answers to these issues are so in conflict with themselves, the ruling of the court and the testimony that a judgment cannot be sustained thereupon.

To further complicate this matter, the jury found that plaintiff failed to ascertain if this solvent was flammable (this is confusing because the jury had already answered that appellant did not fail to warn him of that fact); that he failed to keep a proper lookout; that he failed to heed the warnings on the barrel containing the solvent, and that in each case, although this was negligence on his part, it was not a proximate cause. The jury then found that his boss failed to warn him, but that such— though negligent—was not a proximate cause. The jury then found that plaintiff's boss failed to heed the warnings on the barrel, but that such, though negligent, was not a proximate cause. The jury further found that McWhorter, contrary to what the plaintiff himself testified, permitted the paraffin to be poured into a hose, and that such was negligent, but not a proximate cause. The jury then went on, and in answer to Issue 29 found that plaintiff's own employer, Cody & Teague, failed to warn him of the danger in using the solvent, but that such was not negligent (of course, in Issue 10 they found that plaintiff had been warned by Shell Oil Company). From this group of issues it appears that the jury found plaintiff negligent in many respects, but then held that none of these acts of negligence proximately caused the accident. It is difficult to understand how

a jury would find that the plaintiff failed to heed the warnings on the barrel of solvent, and at the same time find definitely that he had been warned of the dangerous qualities of the contents of the barrel.

It is our belief and holding that these issues are so in conflict, not only with each other, but with the testimony of the plaintiff himself, that a judgment cannot properly be sustained. For us to try, here, to sustain the issues we think properly submitted and sustained by the evidence, and strike out those that were not, would be, in effect, to re-try the case in an appellate court, thereby usurping the proper function and responsibility of the trial court. Even so, we do not think such could be done on the basis of the many existing conflicts.

We do not pass on the court's finding as a matter of law that appellee was not a loaned servant, with its accompanying result, that, therefore, the doctrine of assumed risk would not apply. We pass only on the conflict caused by the various answers of the jury, the testimony, and the court's ruling. For these reasons we believe that this case must be reversed and sent back for a new trial to determine the necessary issues.

■ Appellant's seventh point, we think, ought to be sustained, in as much as this point complains of the trial court's failure to submit Special Issue No. 2, which inquired whether the accident resulted from transitory conditions arising out of performance of the work. We think this is fairly evident in that the plaintiff and Faulkner poured the solvent in this container, tried to pump it out, and then, together, got up on top of the truck and poured it into the hose. According to the jury's findings, at the time of this incident plaintiff knew he was handling a highly inflammable product. We think the case of Texaco, Inc. v. Roscoe (5 Cir., 1961), 290 F.2d 389, illustrates our holding on this matter, wherein the court says:

"In the circumstances of this record the ' * * * danger to which * * *

(plaintiff) * * * became subjected was a danger which came into being, not from the condition of the premises or the place of work, but from the manner of performance of the job to be done by those who were working together.' Moore v. Texas Co., 1956, Tex.Civ.App., 299 S.W.2d 401, at page 403, error refused, n. r. e. For, as that case declares the Texas law, the ' * * * owner of the premises is under no duty to the employee of an independent contractor to see to it that the work is done safely.' 299 S.W.2d 401, at page 403."

See also, Perez v. Hernandez (Tex.Civ. App., n. r. e.), 317 S.W.2d 81, and Moore v. Texas Company (Tex.Civ.App., n. r. e.), 299 S.W.2d 401.

■ We believe appellant's ninth and tenth points should also be sustained. It appears that the attorney for plaintiff-appellee, in commenting upon the calling of a Dr. Payne by appellant, said as follows:

"Dr. Payne, who specially examined this man for the insurance company at their own special request, and was called here by them solely, is not this man's doctor in any way."

The record further shows that jury argument concluded at about six P.M., and that an hour and half later, during which time the jury had been out to dinner, the court then instructed the jury as follows:

"Ladies and Gentlemen of the Jury:

"You are further instructed that you will not consider for any purpose or discuss in your deliberations or refer to whether either party is covered by insurance."

We do not believe that this error, as illustrated by the quoted comment of the attorney, was cured by the judge's instruction, but rather falls under the language in Griffith v. Casteel (Tex.Civ.App., n. r. e.),

728

313 S.W.2d 149, wherein the court states as follows:

"We, therefore, conclude that the comment of appellee's counsel was of the 'incurable' type, and that any curative measures that might have been attempted by either the court or counsel could have served only to accentuate and magnify the prejudicial effect of the statement."

There are many cases on this point, but we do not believe further citation of authority is necessary in sustaining appellant's ninth and tenth points.

■ We also think there is merit in appellant's eleventh point. With regard to this matter, the attorney for plaintiff stated, "That those things being true, we do not feel that there was any reason, since the treating doctor gave this man a high degree of disability, to turn him * * *" The same attorney later said: "Do you want to introduce this report of Dr. Johnson in evidence?" The harm here lies in the fact that this statement, of course, was hearsay and based on the doctor's report which the court had previously instructed the jury not to consider. Hearsay may not always be serious enough to constitute reversible error, but in this case there was a very sharp divergence between the opinions of the doctors, plus the fact that payroll records were introduced to show that although appellee was off work during July following the accident, his earning thereafter—to-wit, during August, September and November—in some cases exceeded the earnings that he had acquired in any month directly prior to the accident. There was evidence that a foreman for another company testified he had not noticed that plaintiff had any limp; and also that plaintiff had signed a written statement with H. B. Zachary & Company in which it was stated: "I had no disability to my leg from being burned." For these reasons we believe that the reference to a doctor's report which the court had admonished the jury to ignore, and which was not in evidence, is especially harmful and consequently calculated to cause or produce an improper verdict, and constituted error. We therefore sustain appellant's eleventh point.

Our holding, therefore, is and must be that because of the various conflicts and incongruities heretofore illustrated, and because of the errors with reference to insurance and hearsay testimony, this case must be reversed and remanded to the trial court so that a proper determination of the necessary issues can be accomplished and the errors mentioned eliminated from any future trial.

The judgment of the trial court is reversed and the case remanded.